## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| RAM CONSTRUCTION SERVICES OF CLEVELAND, LLC, | ) ) | Case No.1:20-cv-2227 |
| | ) | Judge J. Philip Calabrese |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KEY CONSTRUCTION, INC., | ) ) | |
| Defendant. | ) ) | |

## OPINION AND ORDER

This diversity action arises from the renovation of what is known as the Verizon Cleveland Building in downtown Cleveland.  Plaintiff RAM Construction Services of Cleveland, LLC contracted with the general contractor of the renovation, Defendant Key Construction, Inc. to restore the building's masonry, among other things.  RAM Construction finished the façade restoration under the subcontract and sued Key Construction for damages, seeking compensation for additional work that it completed.  Defendant moves for summary judgment on all of Plaintiff's claims, arguing that RAM Construction did not comply with subcontract before commencing the additional work.  (ECF No. 16.)  For the following reasons, the Court **GRANTS** Defendant's motion for summary judgment.

## STATEMENT OF FACTS

At this stage of the proceedings, the record establishes the following facts, which the Court construes in the light most favorable to Plaintiff as the non-movant.

## A.     The Companies

Defendant Key Construction, Inc. is a commercial contractor offering facility, pre-construction, and construction services on various projects throughout the United States.  (ECF No. 1-1, ¶ 9, PageID #8; ECF No. 4, ¶ 9, PageID #149.)  Plaintiff RAM Construction Services of Cleveland, LLC is a construction company providing waterproofing and restoration services on construction projects throughout the Midwest.  (ECF No. 21, PageID #355.)

## B.     The Project

Verizon Building Purchasing, LLC owns the seven-story Verizon Cleveland Building in downtown Cleveland.  (ECF No. 1-1, ¶ 10, PageID #9; ECF No. 4, ¶ 10, PageID #149.)  In 2018, Verizon Building sought to restore and reseal the building's façade.  (ECF No. 1-1, ¶ 13, PageID #9; ECF No. 4, ¶ 13, PageID #149.)  Verizon Building hired Key Construction to act as the general contractor for the project.  (ECF No. 1-1, ¶ 10, PageID #9; ECF No. 4, ¶ 10, PageID #149.)  Key Construction subsequently hired RAM Construction as a subcontractor for the building's masonry restoration and tuck-pointing work.  (ECF No. 28-2, PageID #526–30.)

## C.     The Subcontract

On November 2, 2018, RAM Construction and Key Construction entered into a subcontract worth $731,934.00.  (ECF No. 1-1, ¶¶ 14 & 17, PageID #9; ECF No. 4, ¶¶ 14 & 17, PageID #149.)  This price was estimated based on the quantities for labor and materials outlined in the plan and specifications prepared by the project's architect, EXP (ECF No. 1-1, ¶¶ 14 & 16, PageID #9; ECF No. 4, ¶¶ 14 & 16, PageID

#149) and RAM Construction's per unit price bid (ECF No. 21, PageID #364–65; *see also* ECF No. 29-1, PageID #649–51 (detailing bid proposal)).

The subcontract specifically provides for potential changes to the time or price for RAM Construction's work on the project.  (ECF No.  1-1, ¶ 20 PageID #9–10; ECF No. 4, ¶ 20, PageID #149; *see also* ECF No. 28-2, PageID #533.)   Section 8 of the subcontract states, in relevant part:

> When Contractor [Key Construction] orders in writing, Subcontractor [RAM Construction] shall make any and all changes in the Work which are within the general scope of this Subcontract.  Adjustments in the Subcontract price or Subcontract time, if any, resulting from such changes shall be set forth in a written change order.  No such adjustments shall be made for any changes performed by Subcontractor that have not been ordered in writing by Contractor.

(ECF No. 28-2, PageID #533.)

Additionally, the subcontract attaches an exhibit that contains special provisions.  (ECF No. 28-2, PageID #541.)  This exhibit provides that, where a conflict exists between the special provisions and any other document of the subcontract, the more stringent will apply.  (*Id.*, § 33, PageID #545.)  Sections 33 and 34 of the special provisions detail requirements for change orders and construction change directives. (*Id.*, PageID #545–46.)  Section 33 states, in relevant part:

> Only written change orders issued by **Key** and signed by both parties will be considered for payment.  No change orders will be considered for payment unless approved by **Key's** Project Manager **prior** to work being performed.  The authorized Project Manager for Key on this project is **Will Daniel**.  **Field authorized changes will not be considered an authorized change order until approved by Key's project manager**.

(*Id.*, PageID #545.)  Also, Section 34 explains that:

> **Construction Change Directives** may from time to time be issued in the absence of a total agreement on the terms of a subcontract change order, or in the absence of total approval of the subcontractor requested change by the Owner & Architect.  If a Construction Change Directive is issued, the changed work will be required to progress in a manor not to [a]ffect the project schedule while the terms of the change order are negotiated and resolved.

(*Id.*, PageID #546.)

Further, the subcontract details how RAM Construction may notify Key Construction of a claim for an increase in the subcontract price or change in time. (*Id.*, § 9, PageID #534.)  Section 9 of the subcontract provides that RAM Construction must give Key Construction "advance written notice of any claim for an increase in the Subcontract price and/or the Subcontract time within ten (10) days after the occurrence giving rise to the claim or within ten (10) days after Subcontractor first recognizes the condition giving rise to the claim, whichever is earlier."  (*Id.*)  Additionally, Section 9 disallows any adjustment for work performed without a timely, written claim, which Key Construction authorizes through a written change order.  (*Id.*)  "[F]ailure or delay by Contractor [Key Construction] to require performance of any provision of this Subcontract shall not be deemed a waiver of its right to enforce such provision." (*Id.*, § 21, PageID #537.)

Finally, the subcontract contains a lien waiver in Section 17.  (*Id.*, PageID #536.)  This section provides that, "[n]otwithstanding any other provisions herein and, to the fullest extent permitted by law, Subcontractor irrevocably waives any right to file a mechanic's lien or materialman's lien on the Project."  (*Id.*)

### D.      Work Under the Subcontract

Initially, the work proceeded as planned, and RAM Construction worked on one elevation at a time.  As each elevation neared its end, Chris Schrank, EXP's engineer and the person who helped oversee the project's progress, reviewed the work and issued punch lists to RAM Construction, which listed any deficiencies in the completed work that need to be corrected before moving on to the next elevation. (ECF No. 27-1, PageID #508–10.)

Occasionally, RAM Construction's Project Manager, Michael Smith, submitted change requests for additional quantities or the scope of work.  For example, RAM Construction submitted a change order for additional quantities to fix part of the building that posed a hazard of falling concrete.  (ECF No. 27-1, PageID #499.)  In that change request, RAM Construction stated that Chris Schrank (EXP's engineer) directed RAM Construction to repair the hazard.  (ECF No. 28-3, PageID #548.)  Will Daniel, Key Construction's project manager, then submitted this request to Verizon Building for approval and subsequently issued a change order.  (ECF No. 27-1, PageID #500.)  Key Construction issued a total of five change orders, each of which was issued by February 2019, after the work they had covered had already started or finished.  (ECF No. 21, PageID #361.)

### E.      The Disputed Work

In March 2019, Smith left his position at RAM Construction, and James Nystrand, who previously directed façade restorations, took over as the project lead. (ECF No. 19, PageID #290 & #292.)  Around this time, RAM Construction provided written notice of additional quantities of materials for the south and west elevations.

(ECF No. 17, PageID #263; ECF No. 28-4, PageID #563.) In March 2019, RAM Construction informed Key Construction by email of the potential need for additional materials to complete the project. (ECF No. 17, PageID #263; ECF No. 28-4, PageID #560–61.) In response, Will Daniel (Key Construction's project manager) said, "thanks for the update." (ECF No. 17, PageID #265; ECF No. 28-4, PageID #560.) RAM Construction took Daniel's statement as a promise that Key Construction would issue change orders for the additional work. (ECF No. 29-1, ¶ 19, PageID #646; *see also* ECF No. 17, PageID #272.) As a result, RAM Construction continued to perform the disputed work without a change order. (ECF No. 19, PageID #297.) In April and May 2019, RAM Construction documented and reported the additional work quantities in two invoices sent to Key Construction. (ECF No. 28-9; ECF No. 28-10.)

In June 2019, when the project was completed, Key Construction reviewed the invoices and rejected line items that included the labor and materials for the additional work because there were no corresponding change orders or change directives. (ECF No. 17, PageID #278; ECF No. 28-11.) Subsequently, Key Construction paid RAM Construction but did not pay for the additional work at issue (ECF No. 28-11, PageID #605), totaling approximately $350,000 (*See* ECF No. 1-1, ¶ 45, PageID #12; ECF No. 4, ¶ 45, PageID #152; ECF No. 1-1, PageID #111.)

## STATEMENT OF THE CASE

As a result of Key Construction's non-payment for the additional work, RAM Construction filed a mechanic's lien with the Cuyahoga County Fiscal Officer in the amount of $349,168.32. (*Id.*; ECF No. 1-1, ¶ 44, PageID #12.) On January 20, 2020,

6

Key filed a bond pursuant to Section 1311.11(C) of the Ohio Revised Code, in the amount of $523,752.48 to discharge the lien.  (ECF No. 1-1, ¶ 46, PageID #12; ECF No. 4, ¶ 46, PageID #152; ECF No. 1-1, PageID #115–21.)  On February 28, 2020, the Cuyahoga County Court of Common Pleas entered an agreed judgment and discharged RAM Construction's lien.  (ECF No. 1-1, ¶ 48, PageID #12; ECF No. 4, ¶ 48, PageID #152; ECF No. 1-1, PageID #123–24.)  That agreed judgment specifically provided that the approval "of the bond to discharge mechanics' lien is not an acknowledgement of the validity of Ram's lien.  Key may contest any further proceedings before this Court including the existence, amount or validity of any such lien."  (*Id.*, ¶ 3, PageID #124.[1])

On September 4, 2020, RAM Construction sued Key Construction in the Cuyahoga County Court of Common Pleas.  Plaintiff alleges six counts, seeking to recover the costs it incurred performing the additional work on the Verizon Cleveland Building, including:  (1) breach of contract; (2) claim on bond; (3) unjust enrichment; (4) promissory estoppel; (5) fraud in the inducement; and (6) Ohio Prompt Pay Act violations.  (ECF No. 1-1.)  Key Construction removed the case to federal court on

---

[1] As a judge in State court, the undersigned signed the agreed judgment, though he has no recollection of doing so.  The docket from the State court confirms that the undersigned had no involvement in that matter other than signing the agreed judgment.

Upon review of 28 U.S.C. § 455 and Canon 3C of the Code of Conduct for United States Judges, the undersigned finds no reason he cannot proceed in this action and preside fairly and impartially.  Additionally, the same counsel in this case were counsel of record and signed the agreed judgment in State court and have not raised any issue or concern with the undersigned presiding.

October 1, 2020 (ECF No. 1) and now moves for summary judgment on all counts.
(ECF No. 16.)

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, "the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In doing so, the Court must view the evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must then "set forth specific facts showing there is a genuine issue for trial." *Id.* (citing *Anderson*, 477 U.S. at 250). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgement is not appropriate. *Tokmenko*, 488 F. Supp 3d at 576 (citing *Anderson*, 477 U.S. at 250).  If the evidence, however, "is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.*  The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

"Just as plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (cleaned up).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

## I.    Breach of Contract

Plaintiff alleges that Defendant breached the subcontract by failing to issue a change order and pay Plaintiff for the extra work that it did on the project. (ECF No. 1-1, ¶ 52, PageID #13.)  Alternatively, it asserts that Defendant waived any change-order requirement and, therefore, owes Plaintiff for the additional work in question. (*Id.*, ¶ 53, PageID #13.)

Contract construction presents a question of law "and is appropriate for resolution on a motion for summary judgment." *Reed v. Freebird Film Prods., Inc.*, 664 F. Supp. 2d 840, 845 (N.D. Ohio 2009).  Under Ohio law, courts enforce

agreements as written, even if doing so results in hardship or advantage to a particular party:

> [W]here a contract is plain and unambiguous, it does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto and a corresponding advantage to the other, [and] that it is not the province of courts to relieve parties of improvident contracts.

*Dugan & Meyers Constr. Co. v. Ohio Dep't of Admin. Servs.*, 113 Ohio St. 3d 226, 2007-Ohio-1687, 864 N.E.2d 68, ¶ 29. "Unless there is fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement." *Id.*

In this case, the terms of the subcontract at issue are not in dispute and are plain and unambiguous with respect to the parties' rights and responsibilities. According to the subcontract, there are two ways by which Plaintiff is entitled to payment for additional work in the normal course. The Court addresses each in turn, as well as Plaintiff's waiver argument.

### I.A.   Change Orders

First, where Key Construction issues a "written change order," RAM Construction will complete the additional work. (ECF No. 28-2, ¶ 8, PageID #533.) Under the special provisions, "[o]nly written change orders issued by Key and signed by both parties will be considered for payment." (*Id.*, ¶ 33, PageID #545.) To increase the price for additional work, Plaintiff must "give Contractor advance written notice of any claim for an increase in the Subcontract price . . . within ten (10) day after the occurrence giving rise to the claim or within (10) days after the Subcontractor first recognizes the condition giving rise to the claim." (*Id.*, ¶ 9, PageID #534.) After

10

providing notice or asserting a claim, Key Construction would decide whether to issue a written change order.

In its motion for summary judgment, Defendant argues that the plain terms of the subcontract show that Plaintiff has no entitlement to payment for the additional work performed. Defendant maintains that it did not issue a change order for the work at issue and that RAM Construction did not provide proper notice of a claim pursuant to Section 9 of the subcontract. (ECF No. 16, PageID #229.) Further, Defendant maintains that it was not aware that RAM Construction was seeking payment for additional work and increased costs until June 2019 when it reviewed RAM Construction's March and April invoices—which were submitted in May 2019. (*Id.*, PageID #223–24.) In Defendant's view, Plaintiff (1) knew about the change-order procedure, (2) failed to provide timely notice or otherwise request a change order for the work that was included on the March and April invoices, and (3) did not receive a construction change directive to complete any of the disputed work without a change order.

After careful review of the record, the Court finds that there is no genuine dispute of fact that Plaintiff failed properly to follow the necessary steps that the subcontract and its special provisions prescribe for RAM Construction to receive payment for the extra work in dispute. For two months at the beginning of 2019 when Michael Smith served as its project manager, the record demonstrates that RAM Construction properly submitted requests for change orders. (ECF No. 21, PageID #361.) Nonetheless, RAM Construction failed to secure a change order for

the work at issue or to provide notice to Key Construction of the additional work later included in the March and April invoices.

### I.B. Change Directives

Second, where the parties do not have total agreement on a change order or pending approval, Key Construction may issue a "construction change directive." (*Id.*, ¶ 34, PageID #546.)  Under this special provision, from time to time Verizon Building or Key Construction may direct RAM Construction to perform "changed work . . . while the terms of the change order are negotiated and resolved." (*Id.*)  This provision remains subject to the requirements in Sections 8 and 9 of the subcontract and Section 33 of the special provisions, which make payment dependent on a written change order and require Plaintiff to notify Defendant of its claim.  In other words, the process for a change directive creates a limited exception to the requirement that a change order authorize work before it begins for RAM Construction to receive payment for it.

Plaintiff contends that there are genuine disputes of material fact over whether Defendant issued change directives for the additional work at issue. Specifically, Plaintiff points to three facts in particular:  (1) an email exchange between Smith and Daniel in March 2019; (2) an email from Kristyn Hall, one of Defendant's accountants; and (3)  punch lists from Schrank, EXP's engineer.  But none creates a genuine dispute of fact.  The record contains no evidence from which a reasonable jury could find that Defendant issued change directives for the work in dispute based on any of these facts.

### I.B.1. Email Exchanges

*First*, Plaintiff claims that three emails exchange between Smith and Daniel confirms that Defendant authorized additional work.  (ECF No. 29-1, ¶¶ 17–20, PageID #646.)  On February 15, 2019, Daniel (Key Construction's project manager) emailed Smith, admonishing RAM Construction for a failure to work 10-hour days during good weather and not having enough manpower for the project.  (*Id.*, PageID #662–63.)  He also threatened to start back charging for certain time if the project was not completed by April 1, 2019.  (*Id.*, PageID #663.)  Contrary to directing additional work, it seeks performance of the project on the terms to which RAM Construction had already agreed.  In response, Smith discussed change orders issued to date, which do not include unforeseen weather delays or more materials for work on the south elevation.  (*Id.*, PageID #662.)  Smith's response does not suggest any change order approving the disputed work or the existence of a change directive.

On March 12, 2019, Smith responded to an email from the prior day Daniel sent, inquiring about a finish date for the project.  (*Id.*, PageID #661.)  Daniel also requested an updated schedule, including dates of window and panel installation, noting that RAM Construction had failed to meet a single date provided to the owner.  (*Id.*)  Smith advised that he was working on a new schedule and noted that "additional quantities as well as unforeseen conditions (i.e., [c]hange orders)" account for the scheduling issues.  (*Id.*)  Again, this exchange does not constitute a change order or a change directive—just a request for a schedule that Key Construction could provide to Verizon Building.

13

Finally, on March 15, 2019, Daniel followed up on the request for a schedule from a few days earlier. (*Id.*, PageID #660.) Smith emailed back that work would start on Monday with additional manpower for the west elevation and a remaining part of the north elevation. (*Id.*, PageID #659.) "Again, this is additional manpower so it does not interfere with forward progress elsewhere." (*Id.*) Smith informed Daniel that Schrank "verbally instructed [them] to proceed as the plans show for all South Elevation work, as well as the West Elevation (behind the sign)[. W]e will proceed with performing the work as the contract documents state." (*Id.*) By the following week, Smith told Daniel that "we will have a high level understanding of possible additional quantities on the West Elevation, as stated before additional quantities or delays could impact the completion date." (*Id.*, PageID #560–61.) In response, Daniel replied, "Okay thanks for the update Michael." (*Id.*, PageID #560.)

Plaintiff reads this last exchange as a change directive. In context, however, Daniel's email merely acknowledges the information Smith relayed, and no reasonable jury could find otherwise. Simply put, the subcontract and its special provisions allow informality, but not to that extreme. Viewed in the light most favorable to Plaintiff, Smith's email advises, at most, that RAM Construction might require "*possible* additional quantities on the west elevation." (*Id.* (emphasis added)). The parties' subcontract and its special provisions require more than an acknowledgement of a possibility to authorize additional work, whether through a change order or a change directive.

14

### I.B.2. Transmittal of Revised Billings

*Second*, Plaintiff points to an email dated June 4, 2019 from Hall, an accountant for Key Construction, which states: "attached are the revised billings for your use.  These markups are for change orders not yet issued.  I know Will [Daniel] planned to get with y'all on those once he returns from back surgery." ([ECF No. 28](#)-11, PageID #604.)  Viewed most favorably for Plaintiff, this transmittal of revised billings does not show that Key Construction issued a change directive to complete the additional quantities.  For one thing, the billings came after the project, contrary to the subcontract.  Further, when read in conjunction with the attached revised billings—which strike the charges for the additional work—Hall's statement shows that Defendant did *not* authorize and would not pay for the additional quantities because there were no corresponding change orders or change directives. ([ECF No. 28-11](#), PageID #604–14.)

### I.B.3. Punch Lists

*Third*, Plaintiff relies on the various punch lists that EXP's architect, Chris Schrank, issued to RAM Construction as it neared completion of each elevation of the Verizon Cleveland building.  Plaintiff points to several places in the record that it says shows that the punch lists were used as change directives to authorize additional work outside the scope of the work already covered by the subcontract. ([ECF No. 29](#), PageID #626–27.)  Specifically, Plaintiff points to the testimony of Schrank, Connor Frazell (Daniel's assistant project manager at Key Construction), and the punch lists themselves.  (*Id.*) On review, and not taken out of context, the record does not support Plaintiff's assertions about this evidence, even construing it in Plaintiff's favor.

15

Schrank testified that RAM Construction "would complete those items" on the punch list.  (ECF No. 27-1, PageID 509.)  Based on this testimony, Plaintiff argues that the parties knew Key Construction directed RAM Construction to conduct additional work.  In context, however, Schrank testified that the punch lists cover "deficiencies in the work they performed."  (*Id.*, PageID #508.)  Frazell testified that he made sure RAM Construction completed the work on the punch lists and, like Schrank, confirmed that the punch lists include "items that are not satisfactory to either us or the owner that need fixed."  (ECF No. 25-1, PageID #414.)  Additionally, the punch lists themselves notate in red all of the items that needed to be fixed, but nothing in them shows an authorization for additional work or payment.  Nor does anything in the record.  In short, each of these pieces of evidence confirms that the punch lists cure deficiencies within the existing scope of work.

Taking the record in the light most favorable to Plaintiff, no reasonable jury could find that Defendant issued change directives for the additional work in dispute.

### I.C. Waiver

Plaintiff argues that there is a genuine dispute of fact whether Defendant impliedly waived the change-order requirement through the parties' course of dealings.  (ECF No. 29, PageID #631.)  It asserts that (1) the parties' pattern and practice of conducting business impliedly waived the requirement, and (2) the March 15, 2019 email from Daniel expressly waived the change-order provision.

The subcontract provides that "failure or delay by Contractor to require performance of any provision of this Subcontract shall not be deemed a waiver of its right to enforce such provision."  (ECF No. 28-2, ¶ 21, PageID #537.)  Further, under

16

Ohio law, waiver of a contract provision governing written change orders "must either be in writing, or by such clear and convincing evidence as to leave no reasonable doubt about it." *Foster Wheeler Enviresponse v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St. 3d 353, 364, 678 N.E.2d 519, 528 (1997). "Mere knowledge, and even acquiescence, is not enough for recovery." *Id.*

Under this high standard, nothing in the record shows a waiver. At best, Plaintiff can point to the March 15 email from Daniel, in which he wrote, "thanks for the update." (ECF No. 29-1, PageID #560.) That statement does not amount to an unequivocal waiver of any provision of the subcontract, even if the subcontract did not include its waiver provision. Rather than showing a waiver, the record establishes that, until RAM Construction conducted the additional work in dispute, the parties routinely followed the procedures outlined in their contract for authorization of additional work. Specifically, they did so on five prior occasions immediately before the work at issue. (ECF No. 21, PageID #361.)

As one example, in January 2019, when EXP directed RAM Construction to fix a fall hazard on the northeast and southeast corners of the building, Key Construction issued a corresponding change order. (ECF No. 28-3, PageID #550–52.) As Plaintiffs point out, EXP issued what was the equivalent of a change directive, but in accordance with the subcontract Smith timely notified Daniel of the change in circumstances, and Daniel later issued a written change order. (ECF No. 25-1, PageID #424.)

Plaintiff does not identify, and the record does not show that the parties operated under, some practice or procedure that waived the change-order provision. Even assuming that Defendant failed to enforce the provision on some prior occasions, the subcontract provides that "failure or delay by Contractor to require performance of any provision of this Subcontract shall not be deemed a waiver of its right to such provision, or waiver of any other right." (ECF No. 28-2, ¶ 21, PageID #537.) Accordingly, under the standard, Plaintiff's claim of a waiver fails as a matter of law.

*     *     *

For these reasons, the Court determines that there is no genuine dispute of material fact that Defendant (1) issued no change orders for the additional work at issue, (2) issued no change directives for the work, and (3) did not waive the sections of the subcontract and its special provisions governing additional work.  Therefore, as a matter of law, Defendant did not breach the subcontract by refusing to pay for unauthorized work.

## II.     Claim on Bond

Plaintiff alleges that it is entitled to the bond in the amount of $349,168.32 for the breach of contract alleged.  Defendant argues that, as a matter of law, Plaintiff's claim on the bond that discharged the mechanic's lien is invalid under the terms of the subcontract.

Under Ohio law, an owner or other interested party may discharge a mechanic's lien with court approval by issuing a bond as security for the lien.  Ohio Rev. Code § 1311.11(C).  On termination of that lien, the "surety on the bond steps into the shoes of the owner or mortgagee of the property and is entitled to invoke all

18

mechanic's lien defenses available to the landowner." *A & J Plumbing, Inc. v. Huntington Nat'l Bank*, No. 2014-L-023, 2014-Ohio-5707, ¶ 19 (Ohio Ct. App.) (citing *Midwest Curtainwalls, Inc. v. Pinnacle 701, LLC*, No. 92269, 2009-Ohio-3740, ¶ 59 (Ohio Ct. App.)) (cleaned up).  Therefore, "if the mechanic's lien would not have been enforceable as invalid, the surety cannot be held responsible to pay on the bond." *Id.* (citing *Construction One, Inc. v. Shore Thing, Inc.*, No. 81135, 2003-Ohio-1339, ¶ 25 (Ohio Ct. App.).

Here, the State court terminated the lien and substituted Defendant's bond in its place.  Accordingly, Defendant asserts that under the subcontract, Plaintiff "irrevocably waive[d] any right to file a mechanic's lien or materialman's lien on the Project." (ECF No. 28-2, ¶ 17, PageID #536.)  Under Ohio law, such waivers are valid. *See Steveco, Inc. v. C&G Inv. Assocs.*, No. 77AP-101, 1977 WL 200326, at *3 (Ohio Ct. App. Aug. 4, 1977) (holding that a subcontractor can waive its statutory right to file a mechanic's lien).

Plaintiff argues that the lien-waiver clause was not supported by consideration.  But Ohio law does not require independent consideration for the lien waiver; it is but one of many terms that are part of the subcontract that governs the parties' relationship.  *See Steveco,* 1977 WL 200326, at *2 (distinguishing a circumstance in which independent consideration is required because the lien waiver was not part of the original contract).  Without question, valid consideration supports the subcontract, and there is no dispute that Defendant paid Plaintiff for the work

19

that is not in dispute. Therefore, Defendant is entitled to summary judgment on this claim.

## III.    Unjust Enrichment

Plaintiff contends that it is entitled to damages for unjust enrichment for the additional work in question. Defendant argues that it was not unjustly enriched and, in any event, Plaintiff cannot seek damages for unjust enrichment because the subcontract governs any damages.

Absent bad faith or fraud, Ohio law makes quasi-contractual theories of recovery unavailable where, as here, the parties have a written agreement that covers the claims at issue. "[T]he doctrine of unjust enrichment . . . is 'inapplicable if an express agreement existed concerning the services for which compensation is sought.'" *Champion Contracting Const. Co. Inc.*, No. 03CA0092-M, 2004-Ohio-3406, ¶ 25 (Ohio Ct. App.) (citing *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920 (1989)). Simply, "unjust enrichment is not available when an express contract will afford the complainant the same recovery." *City of Cincinnati v. Cincinnati Reds*, 19 Ohio App. 3d 227, 230–31, 483 N.E.2d 1181 (Ohio Ct. App. 1984).

In this case, the subcontract governs Plaintiff's claim for recovery. As already explained, the subcontract expressly provides for issuing and paying for change orders and change directives. Through this claim for unjust enrichment, Plaintiff seeks to sidestep the infirmities in its contract claim, and Ohio law forecloses such a move. The record provides no evidence from which a reasonable jury can find that Defendant acted fraudulently or in bad faith. At most, communications between the

parties broke down in March 2019 as RAM Construction experienced turnover, and Key Construction had other concerns with RAM Construction's performance. But none of that amounts to a proper legal basis for a claim. Defendant is entitled to judgment as a matter of law on this claim.

## IV. Promissory Estoppel

Plaintiff argues that it is entitled to damages based on a theory of promissory estoppel because Defendant promised to compensate Plaintiff for the extra work in question. Like unjust enrichment, "promissory estoppel is not an available remedy where the legal relationship of the parties is governed by a valid and enforceable contract." *Kahler v. Cincinnati Inc.*, No. C-140407, 2015-Ohio-979, ¶ 20 (Ohio Ct. App. Mar. 18, 2015). Where parties enter into an enforceable written contract "and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel." *Id.*

Plaintiff claims that Defendant made representations and assurances that induced "RAM to perform additional work on the Project." (ECF No. 1-1, ¶ 74, PageID #16.) But the record does not bear out the allegation that Defendant made any such assurance. Even if it did, the subcontract specifies in detail the process for Plaintiff to seek compensation for those assurances. Therefore, this claim does not survive summary judgment.

## V. Fraudulent Inducement

Plaintiff asserts that Defendant fraudulently induced it to complete additional work by promising that pay would be forthcoming. To prove fraudulent inducement, a plaintiff must establish five elements: (1) a false representation concerning a fact

or, in the face of a duty to disclose, concealment of a fact material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) intent to induce reliance on the representation; (4) justifiable reliance on the representation; and (5) injury proximately caused by the reliance. *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (citation omitted). But nowhere in the record is there an implied or express promise that Defendant made or broke, and Plaintiff fails to identify one. Further, under Ohio law, "[a]s a general rule, fraud cannot be predicated upon statements which are promissory in their nature when made, and which relate to future actions or conduct, since a representation that something will be done in the future, or a promise to do it, from its nature cannot be true or false at the time when it is made, and thus cannot generally be fairly viewed as a representation of fact." *Langford v. Sloan*, 162 Ohio App. 3d 263, 2005-Ohio-3735, 833 N.E.2d 331, ¶ 13 (Ohio Ct. App.).

Even if Plaintiff could make out a claim for fraudulent inducement, the economic-loss doctrine bars that claim. "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 106 Ohio St. 3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6. The doctrine polices the boundary between tort and contract law. "Tort law is not designed to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Id.* (cleaned up). Where the parties have an agreement, the damages contemplated "remains the particular province of the law of contracts." *Id.* (cleaned up).

22

Plaintiffs' fraudulent-inducement claim duplicates its breach-of-contract claim and seeks economic losses. Both claims seek damages for the same thing: Defendant's claimed failure to pay under the subcontract. Indeed, Plaintiff and Defendant acknowledge that the additional work in question was not covered by the original agreed-upon price. The subcontract governs any right to additional compensation, both substantively and procedurally. In the context of the relationship between the parties, the economic loss stems from the subcontract, not some preexisting legal duty. For these reasons, Plaintiff may not recover on a claim for fraudulent inducement as a matter of law.

## VI. Ohio Prompt Pay Act

Plaintiff maintains that Defendant failed promptly to pay for the additional work at issue. Ohio's Prompt Payment Act requires that a contractor who is paid by an owner must pay the subcontractor its share within ten (10) calendar days of receipt. Ohio Rev. Code § 4113.61(A)(2)(b)(5).

Here, Plaintiff points to no evidence in the record demonstrating that Key Construction received payment from Verizon Building for the extra work and failed to pay Plaintiff timely. In fact, the record suggests that Defendant never received payment from the owner for the additional work. (*See* ECF No. 17, PageID #282–83.) In the present procedural posture, however, the Court disregards that inference.

Plaintiff argues that payment for the additional work requires only that it timely request compensation from Defendant. But that is not what the subcontract says. Nor is it what Ohio law provides. Under the statute, the contractor need only pay "within ten calendar days *after receipt of payment from the owner for*

23

*improvements to property*."   Ohio Rev. Code § 4113.61(A)(1) (emphasis added).
Without evidence that Verizon Building paid Key Construction for the additional
work at issue, Plaintiff's claim under Ohio's Prompt Pay Act fails for lack of proof.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Key Construction
Inc.'s motion for summary judgment in its entirety.

**SO ORDERED.**

Dated:  August 26, 2022

_____
　　　J. Philip Calabrese
　　　United States District Judge
　　　Northern District of Ohio

24